JOHN R. MOBERLY, Respondent, *v.* THE KANSAS CITY, ST. JOSEPH & COUNCIL BLUFFS RAILWAY CO., Appellant.

### May 4, 1885.

1. NEGLIGENCE—RAILROAD CROSSING—STATUTE PROVISION—CONNECTION BETWEEN NEGLIGENT ACT AND INJURY.—In addition to the common law obligation resting on railroad companies to make reasonably safe crossings where they intersect a public highway, our statute (Sect. 807, Rev. Stat., Mo., 1879) provides: "Every such corporation shall construct and maintain good and sufficient crossings where its railroad crosses public roads or town streets, now or hereafter opened for public use, which crossings shall be constructed of the materials and in the manner following (providing for laying of plank and macadamized pavement), and if such corporation fail to construct and maintain such crossings, it shall be liable for all damages resulting from such neglect." But there must be a direct connection between the negligent act and the injury.—*Wallace* v. *R. R. Co.*, 74 Mo. 594; *C., B. & Q. R. R. Co.* v. *Natska*, 66 Illinois 455; *Stepp* v. *R. R. Co.*, recently decided by Supreme Court of Missouri.

2. SAME—MEANING OF THE TERM "CROSSING"—OBJECT OF THE REQUIREMENT.—The term "crossing" includes the necessary embankments or approaches to the railway, "and this duty imposed by the statute exists at common law." The object of the law is to secure the public from the inconvenience and expense which would result from destruction of the highways when they are crossed by railroads. It is intended by the law, that the corporations owning, or operating such roads, by the construction of sufficiently safe crossings, shall relieve the public of the expense thereof. The highway is to be left by the corporation in as good condition as it was before.—*Farley* v. *R. R.*, 42 Iowa 234. The term is used to indicate the structure intended as a means of crossing the rail-

road ; it is not confined to the part of the structure which is upon the railroad track ; the term includes everything necessary to enable travel to cross the track. This obligation exists in addition to the specifications of the statute as how the crossing over the mere rails of the track shall be constructed, and a full and complete crossing is meant.

3. SAME—WHAT, AMONG OTHER THINGS, IS AN OBSTRUCTION UPON—INSTRUCTION.—The accumulation of weeds, brush, etc., on the right of way of a railroad adjacent to the point of intersection with a public highway, is an obstruction tending to prevent the discovery of an approaching train, and increasing the difficulties of a vigilant outlook from the train, which is one of the duties of a railroad company, and constitutes negligence on the part of the company.—*R. R. Co.* v. *Smith*, 78 Ill. 112 ; *Stepp* v. *C., R. I. & P. R. R.*, Sup. Ct. Mo. (not yet reported). And a failure to predicate an instruction declaring this to be negligence is not tantamount to withdrawing this fact from the jury.—*Goetz* v. *Ambs*, 27 Mo. 32.

4. SAME—PRESUMPTION AS TO DUTY—Every person has the right to presume that every other person will perform his duty and obey the law ; and it is not to be denounced as negligence for him to assume that he is not exposed to a danger which can only come to him through the disregard of law on the part of another.— *Johnson* v. *R. R. Co.*, 77 Mo. 551.

5. SAME—CONTRIBUTORY NEGLIGENCE—DUTY OF PERSON APPROACHING CROSSING AND CORRESPONDING DUTY OF RAILROAD COMPANY.—It is the duty of a person approaching a railroad crossing with a team, that he should, at the nearest and most eligible point to the road, stop his team, listen and look out for any approaching train. It is also obligatory upon the servants in charge of the train to exercise a degree of caution and circumspection in approaching such crossing commensurate with the danger to travel by the public. The responsibility is as real in one case as in the other. Negligence is always a relative question ; it is a question of ordinary care, or it is that degree of care which persons of ordinary prudence are accustomed to employ, under the same circumstances, in order to conduct their enterprises to a successful termination. " Negligence cannot be conclusively established by a state of facts upon which fair-minded men may well differ."— Per Cooley, J., in *R. R. Co.* v. *Steinberg*, 17 Mich. 120.

APPEAL from Buchanan Circuit Court, HON. B. J. COSTEEL, Special Judge.
*Reversed and remanded with directions.*

Statement of case by the court.

This is an action to recover damages for injuries done by a collision with the defendant's train of cars at a public road crossing. The petition charged, substantially, that the defendant is a railroad corporation under the laws of this state, and as such was operating its road through the county of Buchanan, that on the 8th day of December, 1880, while the plaintiff was driving a two horse team, attached to a wagon, across defendant's road at a public road crossing, defendant negligently collided with said team, demolishing the wagon, injuring the horses, and crippling the plaintiff. The negligence charged against the defendant may be summarized as follows: First, in failing to provide and maintain a safe and sufficient highway crossing at the point where its road intersected the public highway, and failing to erect and maintain sufficient warning notice of the approaching trains; second, in negligently permitting trees, brush, weeds, vines and rubbish to grow, accumulate and remain upon the road-bed and right of way of defendant, so as to obstruct the view of passing trains by persons crossing at said point, and the view of persons or teams near said point from the cab or locomotive approaching said point from the south; third, failure to ring the bell or sound the whistle at a distance of eighty rods from said crossing, or at any distance therefrom, and failing to keep a sufficient lookout for persons about said crossing; and fourth, running said train at the time at a dangerous and unusual rate of speed.

The petition prayed judgment for ten thousand dollars.

The answer after tendering the general issue, pleaded that the damages and injuries, if any, sustained by the plaintiff were on account of his own negligence.

On a trial had before a jury the plaintiff was awarded a verdict for two thousand dollars, from which defendant prosecutes this appeal.

The geographical situation of the point of injury was as follows: The Han. & St. Jo. R. R. Co., and the defendant's road, designated as the "K. C." road ran par-

allel, their general direction being from north west to south east. The distance between the roads at the crossing in question was about 33 feet. The public road crossed these two railroad tracks in a direction from north west to south east at such an angle that the distance along the highway between the two tracks is about seventy three feet. The railroad tracks at this intersection ran on embankments that were higher than the former level of the public highway, so that the highway had been elevated on embankments between the two railroads from two and a half to three feet high, and wide enough to admit one wagon to pass freely. Dirt had been taken from either side of these embankments leaving holes along there. This highway was frozen and somewhat slippery from a "skift" of snow on it at the time. There was no macadam nor gravel at this crossing of the railroad track. The highway after crossing the K. C. road, instead of going off perpendicularly, had to turn immediately south along the railroad track for several feet and so close to it that a passing train would likely strike the wheels of a passing vehicle. This abrupt turn at this point was necessitated, because immediately in front of this crossing was a hole, as if the earth had been dugout for purposes of embankment somewhere, so that a wagon was in danger of accident unless it turned directly down the railroad track as suggested. The plaintiff approached this crossing, according to his testimony, after 9 o'clock, P. M. It was rather a cold, moonlight night, He approached from the west side. On that side was a warning sign board, marked : " Look out for the cars. " This stood near the Han. & St. Jo. R. R., and was at the base of the incline starting up to the railroad track. The evidence tended to show that this was the most favorable point for a person approaching these crossings to stop and take observations to ascertain whether any train was approaching on either of said roads. In the direction from which defendant's train approached this night a person standing under the sign board could see it as far as the whistling post or further, which the evidence show-

ed was about one thousand feet from the crossing. Between that point and the crossing, the railroads made a curve towards the west. The next best point of seeing trains approaching from the south was on the H. & St. J. track, and the opportunities for so observing diminished as one went east, on account of this curve, and brush, weeds, etc., on the right of way of the tracks. The plaintiff's evidence tended to show that trees, brush, weeds, and vines, were so thick that the view was cut off so that one could not see an approaching train from the south on defendant's road for over 250 yards, and perhaps more.

He testified that he did stop, just as his wagon stood under the sign board; that he raised his cap from his ears and looked in every direction for approaching trains, that he neither saw one nor heard the noise of one; that he took out his watch and saw that it was far past the time when the train on defendant's road was due at that point—he being familiar with the time of its usual passing; and satisfying himself that the way was clear and safe, he started immediately across. Though the fact is not affirmatively stated by plaintiff, it is fairly inferable from his answer to a question on cross-examination, in which it was assumed that when he started across his cap was over his ears. What sort of covering this was, or to what extent it would likely obstruct his hearing, does not appear. His statement is as follows in this connection:

"I was in a condition to hear. I had a cap pulled down over my ears, and when I stopped I pulled my cap up, and I neither saw nor heard the train. I thought the train had passed, and I started to go on across home. Just as my horses got their front feet over the first rail of the K. C. track, after I went over the H. & St. J.—I was watching the wagon track for I was fearful, it was so narrow, and it took all my attention to keep the wagon on it—and just as my horses were going on the track of the K. C. road, I thought I heard a train, and just then I looked and saw it coming around the curve. It

was then half way, or more, between the whistling post
and the crossing.  Then I commenced whipping to get
across.  If I pulled back off the crossing, the track was
so narrow I would slip off ; then the heads of the horses
were so close I was fearful it would scare them there.  If
they would jump forward it would be on the track.  I
thought I could make it.  I just whipped across as fast
as I could.  Just as I got across and turned down the fill
the cars came by me and as they passed they struck the
hind wheels of the wagon. ''

Q.  "I want to know how far down the fill you had
gone before you were struck?''

A.  "My wagon just got far enough over the crossing
and the horses not far enough over to turn ; I got off the
crossing and down the side of the fill.  I was perhaps a
step or two from the crossing when I was struck, for the
hind wheel that was struck there was the last one going
over.  It was the off hind wheel that was struck—the one
(13) on the right side of the wagon.  Dirt was thrown on
each side of the K. C. track at the crossing and a plank
nailed on the sides of the rails.  I think a plank was in
the middle.  I am not positive.  I don't recollect the
condition it was in.  Don't know as I can tell how far
the bottom of the crossing on east side of K. C. road is
below the top of the rails—never measured it. ''

He did not stop to listen or look for the train after en-
tering upon the movement across the track.  "I was
watching to keep the wagon from slipping.  I knew if I
didn't it would slip.''  " Could pass over the crossing
easily and rapidly, but had to be particular—the road did
not lead off from the track—that was the trouble.''  Fur-
ther, on cross-examination, he stated :

"I would like to have a better crossing.  Nothing par-
ticular was the matter with the crossing.  The road was
too near the track there.  When I first saw the train the
horses were on the track.  I whipped up then to get out
of the way.  The trouble was the road sloped this way.
The hind end of the wagon didn't get clear.  I think
with the same crossing there, but straight across, I could

have got away. I knew that the crossing went angling. I suppose, for I never measured it, that it is five or ten steps from the east end of the ties at the K. C. crossing to where the ground begins to rise. Don't think it begins to rise at 10 feet from the crossing. It is 25 feet higher, 50 feet from there (the east end of ties). The top of the bluff runs right up. Should the road go right east from the crossing it would go right up the hill. I think there would be plenty of room if it went square off. The dirt road leaves the K. C. track not at the same angle it crosses the two tracks, but it turned right down on the side of the track. The hole is at the place marked "A" on the map."

(25) Q. "Is there anything to prevent your driving the five or ten steps where the ground begins to rise?"

A. "There is where the hole was. That hole was all along there. It looked like it might have been dug to fill up with. At the time there was a deep hole there; right along there it was over three feet; it was a great big hole. Looked like the dirt had been taken out of it there. It was about 4 feet—I never measured it—10 or 15 feet the other way."

He also testified that the train was running very fast, and that if any whistle was sounded or bell rung on the car, he did not hear it.

There was other evidence of a corroborative character as to the condition of this crossing and the obstructions.

The evidence on the part of the defendant tended to show that a person on the crossing could have seen an approaching train further than the plaintiff stated, and that there was not the extent of the obstructions claimed by plaintiff. The engineer testified that he sounded the whistle at the whistling post, and that the fireman rang the bell from there to the crossing that he did not observe the plaintiff until his attention was called to him by the fireman, and that he was then within thirty yards of the crossing, and could not stop the train in time. He testified that he was running at about 28 or 30 miles an

hour.   He corroborated the statement of plaintiff about
striking the hind wheel of the wagon next to the track
on the turn of the highway.   The fireman has since died.
These were the only witnesses of the accident.   There
was other testimony, but as it is not essential to the de-
termination of the questions of law involved, it is not
given.

The court on behalf of the plaintiff gave the following
declarations of law:

1.   "If the jury believe from the evidence in this case
that the plaintiff, on or about the 8th day of December,
1880, while driving his two horse team attached to a wag-
on by a set of double harness, of which said team, wagon
and harness plaintiff was the owner, along a public road
at a point where said public road crosses defendant's
railroad track, was run into by defendant's cars and en-
gine, and received injury thereby to his person, or to his
wagon, harness or horses, and that the plaintiff was at
the time guilty of no negligence which directly contribu-
ted to said injury, and that said injury was caused
by the negligence and carelessness of the defendant, its
agents and servants, in handling and running said engine
and train of cars, or in constructing and maintaining the
crossing where said public road crosses defendant's said
track, or in running its said engine and cars over said
crossing, they will find for plaintiff and assess his dam-
ages at whatever amount they may believe from the evi-
dence he has sustained, not to exceed ten thousand dol-
lars."

2.   "It was the duty of defendant when approaching
with its locomotive engine and train of cars the crossing
of a traveled public road, to ring a bell upon such loco-
motive engine at least eighty rods from such crossing
and to keep said bell ringing until it had reached such
road, or to sound a steam whistle upon such locomotive
engine at eighty rods from such crossing and to continue
to sound the same at intervals, until it shall have reach-
ed said road ; and, if the jury believe from the evidence
that the agents or servants of defendant in charge of its

locomotive engine and train of cars approached the place where defendant's railroad crossed a traveled road without ringing such bell, or sounding such whistle in the manner above stated, and that as a direct consequence of such failure, the plaintiff, without negligence on his part directly contributing thereto, was injured by defendant's said engine and train while attempting to cross said railroad at said crossing, then the jury will find for the plaintiff and assess his damages as stated in instruction No. 1, given on the part of plaintiff.''

3. ''It was the duty of the defendant to construct and maintain a good and sufficient crossing where its railroad crossed a public road, to be constructed in the following manner : On each side of each rail a plank not less than eight inches in width should be laid, and the remaining space between the rails should be macadamized. On the outside of each rail there should be a macadamized or gravel pavement of not less than six inches in depth and not less than four feet in width, to be substantially and properly joined up to the said plank, to be laid on the outside of each rail, and if the defendant failed to maintain such a crossing at a point where it crossed a public road mentioned in evidence, and defendant's locomotive engine ran into plaintiff's wagon, while plaintiff was attempting to drive across said railroad on said public road, and said collision and injury were directly caused by the failure of defendant to erect and maintain such crossing then the defendant is liable for the damages sustained by plaintiff on account of such injury unless the negligence of plaintiff directly contributed thereto.''

6. ''In estimating the damages in this case the jury will take into consideration the extent of plaintiff's injury, its probable duration, its effect as to his ability to pursue his ordinary business, and the pain and anguish suffered by him in consequence of such injury.''

7. ''The jury are instructed that if defendant's agents in charge of its train, neglected to ring the bell or sound the whistle attached to its engine as required by instruction No. 2, given in behalf of plaintiff, and that by and

as a direct consequence of such neglect plaintiff was induced to and did cross the track of the Hannibal & St. Joseph railroad, and his position between that track and defendant's was perilous in consequence of the condition of said public road, and of the danger of trains passing on both of said roads, and plaintiff used such measures to extricate himself from such peril as an ordinary prudent man would use under like circumstances and in like peril, and was struck and injured by defendant's train, while using such measures then defendant is liable for damage sustained by him by reason of said injuries.''

The court at defendant's request gave the following instructions:

3. ''The court instructs the jury that there is no evidence that defendant's servants in charge of said train, discovered or knew of the dangerous situation of the plaintiff in time to have avoided the collision, or, that it was possible for them, after such discovery, to have prevented the collision.''

6. ''The court instructs the jury that under the admission of the plaintiff, it is wholly immaterial whether the defendant had erected at the crossing in proof, a sign board warning passers-by of the existence of said railroad crossing, and of the peril of colliding with passing trains, and you will disregard all evidence on that matter.''

7. ''The court instructs the jury that there is no evidence of the negligence of defendant's servants as to the speed of the train in proof, at the time of the collision. Defendant had the right to run said train at any rate of speed, and to pass said crossing either on its card time, or earlier, or later, at any speed, as it, or its servants in charge thereof, might choose, and plaintiff was not excused from the duty to stop, and look, and listen and ascertain if said train was approaching, by the fact that said train was late in arriving at said crossing, nor by the fact of its increased speed, nor by any failure to give signals of its approach, nor by all of said facts, should you find such facts by the evidence.''

8. "The court instructs the jury that the plaintiff in his testimony admits that he neither stopped, nor looked nor listened fo : the train while upon the crossing of the Hannibal road, nor while driving from said crossing over to defendant's track ; for the purposes of this case such admission must be taken as true."

9. "The court instructs the jury that they are not at liberty to find for the plaintiff from the mere fact that he was injured by defendant's train, but the burden is also upon the plaintiff to show by a preponderance of the evidence, to the satisfaction of the jury, that defendant's servants in charge of said train were negligent in some particular, as charged in the petition, and that such negligence caused such injuries—without carelessness or negligence of plaintiff contributing thereto."

10. "If the plaintiff's injuries were caused by the carelessness of plaintiff and of defendant or its servants in charge of said train, the jury must find for defendant."

11. "If the plaintiff's injuries were the result of accident, and without fault in either plaintiff or defendant's servants in charge of said train, the jury will find for defendant."

19. "If the plaintiff, before he got upon the track of defendant's road, could, by looking, have seen the headlight of the engine, and just before he came to, and before he attempted to drive across said track, he actually did see or hear said train, then if he was injured by reason of any miscalculation as to the nearness of the train, or as to its speed, he must bear the consequence of such miscalculation, and the jury will find for the defendant, although they may believe from the evidence that the bell was not rung nor the whistle sounded at and just prior to the time of such injury."

The court of its own motion further instructed the jury as follows :

8. "The court instructs the jury that neither the narrowness of the wagon road between the two railroads, nor the fact that the plaintiff was under the impression that the train had passed by, was sufficient to excuse

plaintiff from not stopping and looking and listening, for the approach of the train.''

20. ''If the plaintiff directly contributed to his injury by failing to stop his team and look and listen for an approaching train before he went upon the track of defendant's road, then the court instructs you that in that case it would make no difference whether the servants of the defendant were also guilty of negligence in some of the particulars named in the petition, or not; your verdict must be for the defendant.''

The court refused the following further instructions asked by defendant:

1. ''The court instructs the jury that they will find for the defendant.''

2. ''The court instructs the jury that there is no evidence that the servants of defendant, in charge of the train in proof, negligently or carelessly ran or managed the train at and just prior to the time of the collision mentioned in the evidence.''

4. ''The court instructs the jury that the law only required the servants of the defendant in charge of the locomotive in proof, to either ring the bell or sound the whistle in approaching said crossing, and there is no evidence in this case that said servants neglected to ring said bell in approaching the crossing at the time of the accident.''

5. ''The court instructs the jury that there is no evidence of negligence of defendant as to the construction or maintenance of the crossing in proof, which in any manner contributed to the injuries of which plaintiff complains.''

14. ''Though you may believe from the evidence that the plaintiff, before driving upon the approach of the Hannibal crossing, stopped his team and looked and listened for an approaching train, yet, the court instructs you that such precaution would not warrant or justify him in pulling his cap down over his ears and driving his team over the crossing and along the road to defendant's track without looking and listening while so driving, for

approaching trains. It was his duty, while thus approaching said track from said point, to look and listen at all points where he could do so, until he had passed over the track, and it was his duty, before driving on defendant's track, to stop his team for the purpose of so doing."

8. "The court instructs the jury, that neither the narrowness of the wagon road between the two railroads, nor the fact that the plaintiff was under the impression that the train had passed by, was sufficient to excuse the plaintiff from stopping and looking and listening for the approach of the train. It was his duty to use his sight and hearing while between said roads, and before passing onto the crossing, to ascertain the approach of said train."

15. "If the jury believe from the evidence that the plaintiff drove his team and wagon from a point west of the Hannibal crossing to and upon the defendant's track, and while so doing neglected to stop and look and listen for an approaching train, they will find for the defendant, notwithstanding they may find from the evidence that defendant's servants in charge of the train in question neglected to sound the whistle for said crossing; and also neglected to ring the bell as the train approached said crossing, and to keep ringing it until said train reached said crossing."

16. "If the jury believe from the evidence, that the plaintiff, while driving from the Hannibal crossing to defendant's crossing in proof, and before driving upon defendant's track, if he had stopped and listened, could have heard the train mentioned in proof, and thus have avoided injury by such collision, and that he neglected to do so, they will find for the defendant."

17. "If the jury believe from the evidence that the plaintiff, if he had looked southward while driving upon or from the Hannibal crossing to defendant's crossing, could have seen the headlight of the train in proof, before driving upon defendant's track, and thus have avoided injury from collision with said train, and

that he neglected to do so, they will find for the defendant."

18. " If the jury find from the evidence that the plaintiff, when he got to the Hannibal crossing, was under the impression and belief that the train had passed, and, acting under such impression gave his whole attention to the management of his team, and failed to stop, or look, or listen, while on the Hannibal road, and while driving from that point to defendant's track ; but drove along over said space of ground, with his cap pulled down over his ears, and his attention fixed upon his team, without endeavoring to ascertain the approach of the train, when he might have learned its approach and have avoided the collision, your verdict must be for the defendant."

20. " If the plaintiff directly contributed to his injury, by failing to stop his team, and look and listen for an approaching train at and just before he went upon the track of defendant's road, then the court instructs you that in that case it would make no difference whether the servants of defendant were also guilty of negligence in some one of the particulars named in the petition or not, your verdict must be for the defendant."

21. " The positive evidence of witnesses who heard the ringing of the bell is not contradicted by the testimony of witnesses who did not hear it, and is entitled to more weight than such negative statements."

22. " The court instructs the jury that the law does not require that wagon roads crossing over railroads should be at right angles with the line of the track, and in this case plaintiff admits in his testimony that his team and wagon were not checked or hindered by any defects in the crossing while passing over the same. "

Strong & Mosman, for the appellant.

I.    The court erred in permitting plaintiff to introduce evidence, as to the condition of the crossing, the manner of its construction and the condition of the ground outside of defendant's track and crossing and outside of the highway.

II.    The court erred in overruling defendant's demurrer to evidence, and in refusing defendant's instruction

marked 1, at close of all the evidence.—*Salter* v. *R. R. Co.*, 75 N. Y. 273 and cases; *Turner* v. *R. R. Co.*, 74 Mo. 602; *Henze* v. *R. R. Co.*, 71 Mo. 636; *Harlan* v. *R. R. Co.*, 65 Mo. 22; *R. R. Co.* v. *Dameill*, 81 Ill. 450; *Haines* v. *R. R. Co.*, 41 Iowa 227; *R. R. Co.* v. *Beals*, 73 Pa. St. 504; *Haas* v. *R. R. Co.*, 47 Mich. 401; *Connelly* v. *R. R. Co.*, 88 N. Y. 336.

III.   The court erred in refusing defendant's 2d, 4th, 8th, 15th, 16th, 17th, 18th and 20th instructions. (Same authorities as above.) And as to defendant's 21st instruction.—*Sullivan* v. *R. R. Co.*, 72 Mo. 195; *Henze* v. *R. R. Co.*, 71 Mo. 639; *Paine* v. *R. R. Co.*, 39 Iowa 523.

IV.   The giving of plaintiff's first instruction was error.—*Zimmerman* v. *R. R. Co.*, 71 Mo. 491; *Benson* v. *R. R. Co.*, 78 Mo. 504; *Yarnell* v. *R. R. Co.*, 75 Mo. 585; *Price* v. *R. R. Co.*, 77 Mo. 508. So as to second instruction.—*Bank* v. *Armstrong*, 62 Mo. 59; *Turner* v. *R. R. Co.*, 78 Mo. 578. So as to third instruction.—*Moody* v. *R. R. Co.*, 68 Mo. 470.

V.   The court erred in refusing to check plaintiff's counsel in the closing argument.—*State* v. *Lee*, 66 Mo. 165; *State* v. *Johnson*, 76 Mo. 125; *Cable* v. *Cable*, 79 N. C. 589; *Heanies* v. *Vogel*, 66 Ill. 401.

VI.   The court erred in overruling defendant's motions to set aside verdict, and for arrest of judgment.

VII.   If from the plaintiff's own evidence his contributory negligence plainly appears, he cannot recover. It does so appear in this case; and the cases in this state are very numerous in which the Supreme Court has held as matter of law, in cases very similar to this, that the plaintiff's negligence prevented a recovery.—*Harlan's case*, 64 Mo. 480; *Kelly* v. *R. R. Co.*, 75 Mo. 139; *Rowell* v. *Ry. Co.*, 76 Mo. 80; *Lenix* v. *Ry. Co.*, 76 Mo. 87; *Zimmerman* v. *Ry. Co.*, 71 Mo. 476; *Salter* v. *Ry. Co.*, 75 N. Y. 273; *Purl's case*, 72 Mo. 168; *Connelly* v. *Ry. Co.*, 88 N. Y. 336; *Fletcher* v. *Ry.*, 64 Mo. 484.

VIII.   The specific charges of negligence as to the crossing, the accumulation of trees, brush, weeds, vines,

and rubbish, so as to obstruct the view of the track, the failure to ring bell or sound whistle, and the running at a dangerous rate of speed, were none of them fairly sustained.

IX.   The instructions asked by plaintiff numbered 1, 2, 3, and 7, were erroneously given. They introduced new issues, submitted deductions of law to the jury enlarging the issues ; and in the second instruction there was no evidence to justify its submission to the jury ; and in the third instruction submitted issues which had been abandoned and were out of the case. The defendant's instructions should have been given. The court erred in refusing and in modifying some of them (as the 8th and 20th).

The verdict was clearly against the law as declared by the court in defendant's 19th instruction, and which was supported by the evidence of plaintiff's own statement and which was the law.—*Moody* v. *Ry. Co.,* 68 Mo. 470 ; *Wilds* v. *Ry. Co.,* 29 N. Y. 315.

RAMEY & BROWN, for the respondent.

I.   The evidence in this case shows that the defendant is not free from blame. The crossing was a dangerous one, being necessarily approached on a narrow embankment lying for more than seventy feet between the tracks of the two railroads, lying little, if any more, than the length of a team and wagon, apart from each other, so that the passage of a train would render the situation of one in a wagon drawn by an ordinary team of horses being anywhere between the roads, extremely dangerous. Add to this the view being obstructed by allowing the accumulation of undergrowth of weeds, bushes, etc., and the misplacing of the whistle post by having it too near the crossing. And finally the crossing was so constructed, and in disregard of the statute provisions, as to require the person crossing to keep along the track for several feet instead of being able to clear it after leaving the track.

II.   The ten other instructions, besides those asked by defendant, assuming that no negligence was proved in this case, may be summed up as follows : That it was the

duty of the plaintiff at the crossing of the Hannibal track to stop and look and listen for an approaching train ; and that he should in passing over that ground have kept on the lookout for approaching trains, notwithstanding any other difficulties he may have been encountering ; and that the failure to do so constituted, as mere matter of law, such contributory negligence as will prevent a recovery.

The question of contributory negligence is determined by the inquiry, whether or not the plaintiff acted as would a man of ordinary prudence surrounded by the same circumstances ; and this is a pure question of fact and must be submitted to the jury.—*Barton* v. *Ry. Co.*, 52 Mo. 253 ; *Doss* v. *M., K. & T. Ry. Co.*, 59 Mo. 27 ; Sherm. and Redf. on Negl., sect. 11.

III.   It is practically undisputed in this case that the defendant by its reckless disregard of the duty enjoined on it by law, enticed plaintiff into a dangerous position ; and if in the state of mind produced by such danger, he had committed the most outrageous blunder in trying to extricate himself the defendant would have no right to impute it to him as contributory negligence ; but in fact he acted wisely and judiciously.—*Adam* v. *Hannibal & St. Jo. Ry.*, 74 Mo. 553.

IV.   The head and front of plaintiff's offending in the case is that he permitted himself to act upon the presumption that defendant would perform a plain legal duty, thereby placing himself in a dangerous situation, from which he could not extricate himself without injury ; and the only defence made is that this confidence was entirely misplaced.   Such a defence ought not to receive encouragement in the courts.

Opinion by PHILIPS, P. J.

I.  We will consider this case in the order of the principal and real grounds upon which the recovery was finally based.  First, as to the sufficiency of the crossing. In addition to the common law obligation resting upon the railroad companies to make reasonably safe crossings where they intersect a public highway, our statute

(section 807) provides that: "Every such corporation shall construct and maintain good and sufficient crossings, where its railroad crosses public roads, or town streets, now or hereafter opened for public use, which crossing shall be constructed of the materials and in the manner following : On each side of each rail shall be laid a .plank of not less than eight inches in width, and the remaining space between the rails shall be macadamized ; on the out side of each rail there shall be macadamized or gravel pavement of not less than six inches in depth, and not less than four nor more than ten feet in width, to be determined by the road overseer or street commissioner, etc. ; this pavement to be substantially and properly joined up to the plank provided to be laid on the outside of each rail.  If such corporation fail to construct and maintain such crossings, such corporation shall be liable for all damages resulting from such neglect."  The evidence in this case tended to show that defendant had not complied with this statute in the construction of this crossing.  But defendant contends that notwithstanding this omission on its part, the plaintiff cannot recover on account thereof, because it is apparent from the evidence that the injury complained of did not result from this neglect.  The law is well settled in favor of this proposition.  There must be a direct connection between the negligent act and the injury.—*C. B. & Q. Ry. Co.* v. *Natze,* 66 Ill. 455; *Wallace* v. *R. R. Co.,* 74 Mo. 594 ; *Stepp* v. *R. R. Co.,* recently decided by Mo. Supreme Court.

We think it a fair deduction from the plaintiff's evidence that the absence of the macadam or gravel did not delay his passage over the track proper.  There was evidence to the effect that, on account of the highway turning as it did immediately parallel with the railroad after crossing, the hind wheel of a wagon next to this rail would "scrape" and slide along the rail.  If this near wheel of the wagon so caught and slid on the rail because the filling between the tracks and the plank was not joined up to the rail, and flush with it, it would be a negligent construction.  The evident object of the stat-

ute in requiring the plank on either side of the rail was to enable the wheels to pass over the rails freely and easily; and if injury resulted from the neglect of this duty on the part of the railroad company an action would lie therefor.— *Wasmer* v. *Del., L. & W. Ry. Co.*, 80 N. Y. 212; *Dalzell* v. *The I. & C. Ry. Co.*, 32 Ind. 45; *The I. & C. R. R. Co.* v. *The State ex rel.*, 37 Ind. 492-502. It is difficult in this case to discover that on this occasion this defect delayed the wagon; but if that was usually the effect, as testified by one witness in substance, it might not be an unreasonable inference for a jury to believe that, in an emergency like that which found the plaintiff at this crossing, when every degree of friction but increased his peril, this fact performed some office in the result.

Conceding, however, that this evidence was of too unsubstantial a character to predicate a verdict on, there is another fact, connected with this immediately, which constitutes, in our opinion, an important factor in this controversy: It is quite apparent from the evidence that had this crossing been so constructed as to have enabled the right hind wheel of the wagon to escape from the rail on the east side of the track simultaneously with the left wheel, the plaintiff in all probability would have gone uninjured. The inquiry, therefore, is: Who is responsible for the condition of this road, as it left the track? The learned counsel for defendant insists that the railroad company has nothing to do with the approach to this road track; that the location of the public road pertains to the county courts, or the county road commissioners, who alone would be responsible for the direction the highway might take after leaving the rails of the railroad. We may concede for the purposes of this controversy, that there would be force in this suggestion, if the railroad had first been constructed along this point. The party coming afterward to locate a highway, intersecting the first located road, might choose its own approach; and, as it would be acquiring an easement, common justice and fairness would require that it should so construct its approach as not unnecessarily to

impair the use to the first occupant of the right of way.

But the evidence of plaintiff, which was uncontradicted, was, that the public highway had been constructed there for thirty years or more, and had been in continuous use ever since by the public, and that defendant was the second comer.

The statute (sect. 807 aforesaid) is quite explicit, that "every such corporation shall construct and maintain good and sufficient crossings where the railroad crosses public roads."

Did this defendant, then, sufficiently and reasonably comply with this requirement, in intercepting the public road, in leaving its approach so as to impair its former use, and in increasing the danger to the public in passing on to and from its track with wagons by simply placing a single plank on either side of the outer rail, and leaving vehicles to escape from its track only by turning abruptly along its railroad ties, and so near that a passing train would collide with the vehicle for several feet? In other words, was it not the plain duty of the defendant to have made at that point a reasonably safe approach to the track of its road, by so constructing the embankment as to have enabled wagons to pass directly off from its road without the danger of running into a pit on its right of way? There was ample room to have done this without turning teams along its track, as was the case at this crossing. How could the company construct and maintain a good and sufficient crossing at such a place, where it had by its interception, interrupted its former use and safety, without restoring it measurably so as to make it good and sufficient? As well say that, where the road was required to construct a bridgeway for a crossing, in the case of a deep cut, it could comply with the law by constructing its bridge over the crossing; providing no aprons, but leaving the ends of the bridge elevated ten feet above the former grade of the highway.

This precise question was passed upon by the Supreme Court of Iowa in *Farley* v. *The C. R. I. & P. Ry. Co.* 42 Ia. 234) in which it is held that: "The term crossing

includes the necessary embankments or approaches to the railway;" and that this duty imposed by the statute exists at common law. Citing *People ex rel. Bloomington* v. *C. & A. Ry. Co.* (Amer. Rwy. Rep. 66), Beck, J., says: "The object of the law is to secure the public from the inconvenience and expense which would result from the destruction of highways when they are crossed by railroads. It is intended by the law that the corporations operating or owning such roads, by the construction of sufficiently safe crossings, shall relieve the public of the expense thereof. The highway is to be left by the corporation in as good condition as it was before. Counsel contend that the embankments constructed as the necessary approach to a railroad crossing is no part of the crossing, and the company is not, therefore, required to keep it in repair. The term occurring in the statute is used to indicate the structure intended as a means of crossing the railroad. It is not confined to the part of the structure which is upon the railroad track. This is obvious from the fact that if an embankment or excavation is demanded to enable the vehicles to cross the railroad, a simple structure upon the track would not be the means of attaining the end required, viz., the crossing of railroad. There would in such case be no crossing, a term including every thing necessary to enable travel to cross the track." See also *The Ind. & Cin. Ry. Co.* v. *The State ex rel.* (37 Ind. 502); *Quinby* v. *Mo. Ry. Co.* (69 Me. 340).

This obligation exists in addition to the specifications of the statute as to how the crossing over the mere rails of the track shall be constructed, for the crossing is to be made good and sufficient; and as a crossing may be good, etc., even when not constructed according to the statutory specifications, so must it follow that the company has not done all, under circumstances like these at bar (where it has impaired the use of the highway), by merely placing, afterwards, planks at the rails.

The allegations of the petition are broad enough to admit this proof; for it is distinctly averred that defendant was "guilty of negligence in that it failed to provide

and maintain a safe and sufficient highway crossing at the point at which said highway intersects said railroad."—Sect. 3527, Rev. Stat. ; *Bennett* v. *Judson*, 21 N. Y. 3238; I. Cn. Pl. 306 ; *See* v. *Cox*, 16 Mo. 166; *Kennayde* v. *Ry. Co.*, 45 Mo. 258-9.

But the difficulty which confronts us in affirming the judgment on this branch of the case is, that the third instruction, given on behalf of the plaintiff, directed the attention of the jury particularly to the manner of the construction of the crossing over the rails of the track ; and the matter of the defendant's duty and neglect as to the condition of said approach was not submitted to the jury for their guidance and finding, as it might have been.    The instruction told the jury they might find for plaintiff, if the defendant failed and neglected to place the macadam or gravel, etc., about the crossing as required by the statute, and the injury resulted therefrom. We do not think, in view of the plaintiff's testimony that he rather attributed his misfortune in this respect to the hindrance incident to making the turn after clearing the track with at least one wheel of his wagon than to any impediment in getting over the rails, that a verdict based on a cause, possibly which he himself disclaimed, ought to be upheld.    Although the plaintiff was entitled, under the pleadings and proof, to have gone to the jury on the condition of said approach, yet, if he saw fit to so limit his ground of recovery touching this defect as not to include such fact, it would be a dangerous precedent in practice to affirm a judgment, which might have been based on a ground not justified by the evidence.

II.   We are of the opinion that the plaintiff was entitled to have considered by the jury the evidence touching the obstructions on the right of way caused, as he claimed by the accumulation of weeds, brush, etc.    Counsel for defendant assumes that this matter was practically abandoned by the plaintiff, because he predicated no distinct declaration of law thereon.    This allegation of the petition and its proof were material and available to the plaintiff to explain how his view of an approaching train

on the road might have been obstructed so as to have prevented the discovery of the train, even had he looked that way while crossing between two tracks. It also bore on the question of the defendant's duty on approaching that crossing to keep a more vigilant outlook for any person likely at such a time to be using the crossing.

Such obstructions at such a place are held to be evidence of negligence on the part of railroad companies. And the defendant, it seems from the evidence thought so, as it, subsequent to this disaster, removed the brush, etc., at this point.—*I. & St. L. Ry. Co.* v. *Smith*, 78 Ill. 112; *O. & M. Ry. Co.* v. *Clutter*, 82 Ill. 123; *C. B. & Q. Ry. Co.* v. *Lee*, 87 Ill. 454. Chief Justice Scott in the first case said: "It was negligence in the company to permit or suffer weeds, or anything else to grow upon its right of way to such a height as would materially obstruct the view of the highway. The safety of persons and property alike makes it necessary the company should keep its right of way free from obstructions, so that persons approaching the crossing may readily ascertain whether there is danger, and the employes in charge may be enabled to discover whether there is anything on the track."

Nor is there anything in any decision of the Supreme Court of this state, to warrant the suggestion of counsel that any different rule obtains in this respect in this state. On the contrary the latest utterance of the Supreme Court recognizes this as law in harmony with the authorities just cited, as it is a rule of common sense and justice.—*Stepp* v. *C., R. I. & P. Ry. Co.*, not yet reported.

Nor can we assent to the proposition that, because the plaintiff did not directly predicate an instruction declaring this to be negligence, it was tantamount to withdrawing this fact from the jury. Judge Richardson in *Goetz* v. *Ambs* (27 Mo. 32) said: "It would be a dangerous practice for this court to establish that every judgment must be reversed, because, though each instruction is

correct by itself, yet, as a whole, they fail to notice some legal proposition that properly arises on the evidence."

III.   The defendant insists that the court erred in predicating any instruction on the question of defendant's imputed failure to ring the bell or sound the whistle, because there was no evidence of such failure.   If the question turned upon the fact whether the defendant's servants either rang the bell or sounded the whistle on approaching the crossing merely, we might be justified in saying the mere negative character of the plaintiff's statement that he did not hear either, was not sufficient, as against the positive statement of the engineer that both were sounded.—*Henze* v. *Ry. Co.*, 71 Mo. 638 ; *Calhoun* v. *Ry. Co.*, 60 N. Y. 137.

But the statute requires railroad companies, on approaching the crossing of the public road, to ring the bell at least eighty rods from the crossing and to continue to so ring it until the crossing is reached, or to sound the whistle at least eighty rods from such crossing.   This requirement could not be met by first ringing the bell or sounding the whistle at a point inside of the eighty rods. Defendant's instruction touching this inquiry entirely ignored this requirement.

Its fourth instruction was properly refused, because it requested the court to say to the jury that the law only required its servants " to ring the bell or sound the whistle in approaching said crossing, and there is no evidence that said servants neglected to ring said bell in approaching the crossing at the time of the accident. "

Under this instruction the jury would have been advised that the defendant had met the law by ringing its bell or sounding its whistle at any point on approaching the crossing, even within one rod of it.   Plaintiff's second instruction very properly told the jury what was the duty of defendant in this respect.   It followed the statute.

What was defendant's proof, in which I think it materially aided the plaintiff ?   The engineer testified that

he sounded the whistle at the whistling post, and that the fireman rang the bell from that point until he reached the crossing. Now the defendant further showed that, by actual measurement, this whistling post was not eighty rods from this crossing, but it was nearly three hundred feet short.

And there is another very significant piece of evidence in this connection that might reasonably have warranted the jury in discrediting the statement of the engineer touching this whole matter. The brakeman, Moore, testified that the air-brakes were put on "four or five seconds after the whistle sounded for the crossing." The baggage master, McAleer, who was next to the tender, testified that the train stopped within five or six seconds after it whistled for the crossing. And the conductor, Howard, that the car commenced to stop when he heard the whistle. All of which goes to show that when the engineer sounded the whistle (which he says was when the fireman began to ring the bell), he was then on the plaintiff, within thirty yards of him. It was evidence tending to discredit the engineer, and disentitling the defendant to have this issue taken from the jury.

Again the positive and uncontradicted evidence of the plaintiff was, that as he approached the Hannibal track he stopped near the intersection, the most available point to discover the approach of any train, that he stopped, listened and looked in every direction. Neither hearing nor seeing any train he drove on at once. His pace was such as to make it probable that he could, with perfect safety, clear both tracks in the time necessary for a train to traverse a distance of 80 rods, or at the utmost, it is inferable, that if the train had sounded the whistle or rung the bell at the required statutory distance he in all probability would have heard the alarm before reaching the first track.

Every person has the right to presume that every other person will perform his duty and obey the law; and it is not to be denounced as negligence for him to assume that

he is not exposed to a danger which can only come to him through the disregard of law on the part of another. This is just and reasonable, and it is axiomatic.—*Kellogg* v. *C. & N. Ry. Co.*, 26 Wis. 223; *Johnson* v. *Ry. Co.*, 77 Mo. 551-2.

IV. The chief contention of defendant's counsel is, that notwithstanding it may have been guilty of negligence, the plaintiff himself was guilty of such contributory negligence as to preclude him from recovering.

The law recognizes the fact that a railroad crossing is a point of danger. As both plaintiff and the company have the right of way the law demands that each should exercise his right regardful of their mutual privileges and obligations. Owing to the peculiar method of operating the trains on railroads, the rate of speed at which they run, the difficulty in checking them, the necessity for exact conformity to their time tables, it is not an unreasonable requirement that they should have the preference over the citizen, or private conveyance, at such crossing. The great peril to life and limb, on account of the number of passengers usually on such trains, imposes a high degree of vigilance on persons about to cross such tracks. Therefore, the law exacted of the plaintiff on approaching this crossing, that he should, at the nearest and most eligible point to the road, stop his team, listen and look out for any coming train.

And while this is so as to him, it was likewise obligatory upon the servants in charge of defendant's train to exercise a degree of caution and circumspection in approaching said crossing commensurate with the danger to travel by the public. So that the law should not be so applied to the citizen as to impose the whole responsibility on him for any injury that might ensue; nor should the rule of requiring the citizen to be on the lookout be so construed as to practically deny him the free enjoyment of the public highway to which he is by law and from necessity entitled.—*Richardson* v. *N. Y. Cen. Ry. Co.*, 45 N. Y. 846; *Johnson* v. *Ry. Co.*, 77 Mo. 546.

The evidence, on the part of the plaintiff, tended to

show that he did observe the obligation of stopping, listening and looking just before venturing upon the crossing. He stopped too at the proper point for taking this observation. His testimony, in this connection, was, that at the point where he so stopped: "to the best of my recollection the hind end of the wagon was under the sign board and the horses close to the railroad." He saw from his watch that the time for the passing of this train had gone by over half an hour. And defendant's witnesses admit that the train was late from 6 to 8 minutes. While it is true, that the fact that the time for the regular coming of this train was up did not excuse the plaintiff from the obligation to keep the look-out and exercise care, yet this is a fact bearing on the question, whether he was exercising that degree of care, which men of ordinary prudence exercise under like circumstances. In *Powell* v. *Ry. Co.* (76 Mo. 82), negligence on the part of the boy killed is, *inter alia*, predicated of the fact that he knew the train was expected at the time, and that should have quickened his apprehension. It must follow logically, that a person, who is familiar with the time of the arrival of a train, and knows the time for its coming has long since elapsed, would not be held to so great vigilance for the coming of that train as if he knew it was about the time for its coming. And when a train is running out of time its servants in charge should exercise increased care and vigilance. As the plaintiff took the requisite observations, and saw from his watch that the train had probably passed, and hearing no signal of any approaching train, he not unreasonably concluded that he might enter upon the crossings and clear both before it was possible for any train to come a distance of eighty rods. And if in fact the train was inside of that distance when he entered upon the first track, he had no signal of the fact at the distance of eighty rods as we have already shown.

We are asked by the defendant to hold as matter of law, that the plaintiff was guilty of contributory negligence in not halting his team and making observations

from the Hannibal track.   This is, as we think, unreasonable.   When the plaintiff left the proper point for observation, near the sign board, he was exposed to four dangers, two from trains that might come from the north and two from trains that might come from the south, on the two roads.   Every moment he should delay, after he moved from under the sign board, would increase this exposure.   Had he stopped on the Hannibal track he would have been immediately exposed to the two dangers from trains on that road.   Negligence would have been clearly imputable to him had he been caught after halting his team on this track, especially after he had seen, when only a few feet from it, that it was clear.   What would have been his situation, if, while halting there, a train had suddenly burst upon him from either direction on either of those roads?   He could not escape backward. He must go forward.   If by the forward movement he might have escaped the train on the Hannibal track, yet, by the time lost in stopping on that track, he would have increased the exposure to danger from a train that might come on the K. C. track.   From the first track over the latter he had to clear a distance of 73 or more feet, and more in avoiding the danger at the turn after crossing the latter.

Should he have stopped on the fill between the two tracks?   His situation here, it is conceded, was a perilous one.   This fill itself was a danger trap.   Who was responsible for its condition?   It was on the defendant's right of way of fifty feet.   As the Hannibal road was subsequently constructed, the presumption is that it had an easement on the right of way of the defendant.—*Rozelle* v. *The Han. & St. J. Ry. Co.*, 79 Mo. 351.   This fill according to the plaintiff's evidence, was three or more feet high, with large holes on either side of it from which the dirt had been dug in making fills; and the road bed was narrow, just so as to pass along with a wagon by careful driving.   There was, on this occasion, a "skift" of snow on it, and it was slippery.   It required his attention to keep his way over it.   Suppose he had stopped

on this "narrow isthmus," the time thus lost exposed him to a coming train. Had he been caught between the two tracks his situation was most perilous. He could not go backward. He could not go to either side. A train was liable to frighten his horses, and as they might plunge forward he might be caught on the rails, or if passing them at the "gallop" he was liable to be upset in making the abrupt turn after clearing the track, or to run into the pit in front of this crossing.

Who can say, under circumstances like these, that it was not the part of prudence and wisdom for the plaintiff, from the moment he left the sign board, to have bent all his energies and attention to clearing the tracks without delay of a halt, or turning his eyes to the right or left? No amount of look-out could have saved him harmless perhaps, had a train come after he entered upon the crossing.

At all events these were very practical questions for the judgment of twelve men, and about which different minds might reasonably differ. It is more a question of fact than one of law. In *Johnson* v. *Ry. Co.* (77 Mo. 553), the court held that an instruction was bad, "inasmuch as it allowed the jury to find for the defendant, if plaintiff did not stop, look and listen for an approaching train in time to prevent a collision, without requiring the jury to go further and find that by stopping, looking and listening an approaching train could have been discovered in time to have avoided the collision;" so here it was eminently a question of fact for the jury, whether, even had the plaintiff stopped on this fill between the two tracks and listened, etc., for a train, he would probably have avoided the injury. Had he looked for the train ever so much, there was evidence that he could not see it very far on account of the weeds, brush, etc., on the track. Whether he might have escaped had he seen it, was a question of fact for the jury under the peculiar circumstances of the case. And the trial court quite strongly gave the defendant the benefit of the omission of plaintiff to so look and listen. It is a

little remarkable, if it be true as contended by defendant that the obstructions did not hinder the view of an approaching train, that the engineer and fireman did not discover the plaintiff sooner. It was a moonlight night, and yet they did not discover the presence of the plaintiff until almost on him—within 90 feet of him. From the Han. track to the K. C. track, was 73 feet. The time occupied by plaintiff in passing from the first track to where he discovered the coming train, admitting he was traveling at the rate of three miles per hour, would have been about 11 seconds. This court is now asked by defendant, under the situation and conditions stated, to declare, as a matter of law, that the plaintiff was guilty of contributory negligence in having his attention withdrawn for eleven seconds, as many beatings of the heart, from the south where this train approached and in a direction somewhat to his right. Negligence is always a relative question. It is a question of ordinary care. This is the caution and vigilance which reasonable and prudent men exercise under like circumstances.—*Flynn v. Ry. Co.*, 78 Mo. 202. Or, as it is aptly expressed in *C. & C. C. R. Co.* v. *Terry* (8 Ohio St. 581), it is "that degree of care which persons of ordinary prudence are accustomed to employ under the same circumstances, in order to conduct their enterprises to a successful termination."

We are of the opinion that it is a debatable question, whether ordinarily prudent men would not have pursued the same course the plaintiff adopted "in order to conduct his enterprise to a successful termination." As such it was a question for the jury and not the court.

We had occasion at this term (in *Cannon* v. *Moore, Adm'r* ; and *Brink* v. *Railroad*) to express our views as to the conditions under which the court is justified in taking a case from the jury.

We will only supplement these by quoting from the opinion of that eminent jurist, Judge Cooley, in *D. & M. Rwy. Co.* v. *Van Steinberg* (17 Mich. 120-1).

"When the judge decides that want of due care is not

shown, he necessarily fixes in his own mind the standard of ordinary prudence, and, measuring the plaintiff's conduct by that, turns him out of court upon his opinion of what a reasonably prudent man ought to have done under the circumstances. He thus makes his own opinion of what would generally be regarded as prudent a definite rule of law. It is quite possible that if the same question of prudence were submitted to a jury selected from the different occupations of society, and perhaps better competent to judge of the common opinion, he might find them differing with him as to the ordinary standard of proper care. The next judge trying a similar case may also be of a different opinion, and, because the case is not clear, hold that to be a question of fact, which the first had ruled to be a question of law. While there is any uncertainty, it remains a matter of fact for the consideration of the jury. The difficulty in these cases of negligent injuries is, that it very seldom happens that injuries are repeated under the same circumstances; and, therefore, no common standard of conduct by prudent men becomes fixed or known. Negligence cannot be conclusively established by a state of facts upon which fair minded men may well differ."

We feel constrained, on a careful review of the evidence in this case, to say that the trial court should not have taken the case from the jury. Its action in this respect is approved. We have examined the numerous adjudged cases to which counsel have referred us. Every case of this character must rest on its own peculiar facts.

V. As this case is to be remanded, we will state that the first instruction given on behalf of the plaintiff should not be repeated in its extent on a further trial. It is faulty in submitting to the jury issues based on the negligence and carelessness of the defendant in handling and running its train of cars, and in running its said engine and cars over the crossing. Even if such issues were within the terms of the petition, there was not sufficient evidence to support them.

Instruction number 7 should also be reformed or refused. It is not obvious what meaning a jury might attach to the word "induced." Nor does the instruction sufficiently connect, in its conclusion, the relation between the imputed act of negligence and the injury. We think the jury was, perhaps, sufficiently advised of the defendant's duty and liability in this respect by the second instruction. Counsel have submitted infinite objections to and criticisms upon most of the instructions given in the cause, except their own. Many of these criticisms are what might aptly be characterized as the "affectation of precision." Taken as a whole, with the exceptions above noted, the instructions quite clearly and consistently presented to the jury the practical issues in this case.

The ceaseless declarations of law asked by the defendant in this case, with their repetition of principles already announced by the court, or varying phraseology, with here and there objectionable and ambiguous terms, might have been properly refused by the court in the interest of brevity and directness, and the suppression of an evil which the appellate courts denounce in vain.

For the reasons given touching the instructions numbered 3, 1 and 7, the judgment of the circuit court is reversed, and the cause remanded for further proceeding in conformity with this opinion.

Ellison, J., concurs. Hall, J., concurs in the result.

Concurring opinion by HALL, J.

I concur in the reversal of the judgment in this case for the reason given therefor in the opinion.